IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Richmond Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 3:19-CR-82 |
| | ) | Honorable Henry E. Hudson |
| ANTHONY EUGENE PETERS | ) | |
| | ) | |
| Defendant | ) | |

**UNITED STATES' RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

The United States, by and through the undersigned attorney, respectfully request that this Court deny defendant's motion to suppress because law enforcement officers did not engage in an unlawful *Terry* stop and frisk.

**I.    BACKGROUND**

On February 3, 2019, at approximately 5:30 p.m., Officer Butler and Trainee Cooper of the Richmond Police Department were driving in a marked patrol vehicle along Creighton Road within Creighton Court Apartments. Creighton Court is property administered by the Richmond Redevelopment Housing Authority ("RRHA"). The Richmond Police Department and RRHA have a Memorandum of Understanding ("MOU") allowing Richmond Police Department to "enforce the trespass laws of the Commonwealth of Virginia" within Creighton Court and other properties. Under this agreement, Richmond Police officers may forbid individuals from returning to RRHA property if the individual cannot adequately demonstrate that he or she is: "1) the guest of a resident, 2) an RRHA employee, or 3) on the property for a legitimate business or social purpose." Additionally, RRHA posts "No Trespassing" signs on the sides of their buildings.

1

While riding along the 2000 block, Officer Butler observed Anthony Peters, wearing a hoodie and "skinny jeans," and Gary Garrison walking along the sidewalk without a Creighton Court leaseholder with them. Officer Butler was familiar with both Peters and Garrison and knew neither to be Creighton Court residents. Additionally, Officer Butler had seen Peters in the Record Management System (RMS) as being a felon with both a gun and drug conviction as well as having a charge for trespassing on RRHA property in Creighton Court in 2011. Officer Butler had read an alert as to Peters that he is a narcotics user and "probably armed." Additionally, Officer Butler had received information from a confidential source that Peters had been engaging in drug dealing in Creighton Court by selling crack cocaine from apartment 2047. This confidential source has worked with Officer Butler for approximately 9 months to a year and has been established as reliable by participating in numerous controlled drug buys. Further, Officer Butler knew Garrison to be barred from RRHA Housing with numerous convictions for trespassing and had previously arrested Garrison for possession with intent to distribute heroin. With this background knowledge of each of the two individuals, Officer Butler decided to make contact with Peters and Garrison to investigate whether they were trespassing and whether they had legitimate business on the property.

Officer Butler initiated the encounter by stating that he believed both individuals were on the banned trespassed list and were "not supposed to be out here." Garrison responded "yeah" as both men continued to walk away from the officers. Officer Butler then immediately asked if either individual had a gun on their person and asked both individuals to lift up their shirts to confirm they did not have weapons on them. Both individuals continued to walk away from the officers. Garrison complied with the officers' request by raising his shirt and revealing his waistband. Garrison then continued walking, feeling free to leave. Peters responded "Nah, I'm good. I don't

have no gun on me" and then voluntarily stopped to speak with officers, partially lifting the front of his hoodie. The officers repeatedly asked Peters to fully lift his hoodie and reveal his entire waistband but Peters responded that he was "not doing nothing" and refused to lift his hoodie. In Officer Butler's seven years of experience, most individuals when asked to lift their shirts comply as Garrison did in order to avoid continued contact with law enforcement. Peters instead nervously and repeatedly patted his jeans and hoodie pocket as if to show he had nothing on him but continued to refuse to lift the front of his shirt. He then refused to be patted down and repeatedly said "I don't have nothing on me." Accordingly, armed with the other information he knew about Peters, Officer Butler became suspicious that Peters may be armed.

During this time, Officer Butler also continued to inquire about trespassing. Officer Butler also asked for identification, which Peters stated he did not have on him. Officer Butler had planned to use Peters's identification to run his identity through his car's RMS to determine if Peters had warrants or was barred from RRHA property. Officer Butler was unable to follow through in this manner when Peters indicated he had no identification on his person. After Officer Butler told Peters he was trespassing, Peters asked how that was the case and then explained that he was no longer barred because he had gone to court over that issue. When Officer Butler asked if Peters had the documentation from that proceeding, Peters said he did not have it on him. Officer Butler continued to investigate if Peters was in fact trespassing pursuant to the MOU given that he was not accompanied by a leaseholder. The officers again asked Peters to lift his shirt; Peters repeated he had "nothing on me."

From debriefs from arrestees in the area, Officer Butler knew that males who wished to conceal firearms would sometimes wear "skinny jeans" and wedge handguns into the front of their pants, with the grip of the gun aligning with the beltline of their pants. The tightness of the jeans

3

or assistance of a belt would hold a weapon securely, allowing them to wear less baggy tops while concealing a weapon. Based upon Peters's nervousness, as shown through his refusal to lift his shirt and his continual touching of his hoodie pocket, as well as Officer Butler's knowledge of how guns are being carried, Officer Butler believed Peters to have a weapon. After being asked "what's that" by Officer Butler, Peters lifted his shirts to reveal his belt buckle. Officer Butler stepped to the right of Peters and observed a bulge that appeared like it could be the muzzle of a handgun to the right of the zipper of Peters's jeans. Officer Butler then moved to Peters, grabbed his right arm, and placed the palm of his hand over the area where he believed the weapon to be. Officer Butler immediately detected the grip of a pistol.

As Officer Butler and Trainee Cooper attempted to place Peters into handcuffs to ensure their own safety, Peters tensed up and was taken to the ground. Trainee Cooper then recovered a handgun from Peters' waist, released the magazine and ejected a round from the chamber. A search incident to Peters's arrest found a baggie containing 3.5 grams of off-white, rock-like substance and several packets of Suboxone. The content of the baggie appeared consistent with crack-cocaine, and field tested positive for cocaine. Officers also found a scale on the ground near where the defendant was taken to the ground.

## II. ARGUMENT

The Fourth Amendment protects people from unreasonable searches and seizures. The touchstone of the Fourth Amendment inquiry is one of reasonableness; requiring a balancing of the public's interest in basic community safety and "the individual's right to personal security free from arbitrary interference by law officers." *See Pennsylvania v. Mimms,* 434 U.S. 106, 108–09 (1977) (per curiam), *United States v. Brignoni–Ponce,* 422 U.S. 873, 878 (1975). An individual is seized within the meaning of the Fourth Amendment "only if, in view of all of the circumstances

surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544 (1980). An officer merely walking up to a person in a public place and asking him questions, does not alone constitute a seizure. *United States v. Lehmann*, 798 F.2d 692 (4th Cir. 1986). Without bringing about a seizure, an officer may not only question an individual as they freely move, *United States v. Gray*, 883 F.2 320 (4th Cir. 1989), but also may overtake the pedestrian and ask him to stop or summon him to where the officer is located. *See e.g.*, *O'Malley v. City of Flint*, 652 F.3d 662 (6th Cir. 2011), *United States v. Ford*, 548 F.3d 1 (1st Cir. 2008), *United States v. Broomfield*, 417 F.3d 654 (7th Cir. 2005).

Further, an officer may, consistent with the Fourth Amendment, conduct a brief investigatory stop, when the officer has a reasonable articulable suspicion that criminal activity is afoot. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). Pursuant to *Terry*, the Fourth Circuit analyzes investigatory stops in two steps: first by determining whether the police officer's action was justified at its inception, and then analyzing whether the police officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop. *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011). Further, an officer is justified in frisking an individual when they have reasonable suspicion an individual is armed and dangerous. *Terry*, 392 U.S. at 27.

The level of suspicion to justify a *Terry* stop must be a "particularized and objective basis for suspecting the particular person stopped of criminal activity." *United States v. Griffin*, 589 F.3d 148, 152 (4th Cir.2009). Whether there is reasonable suspicion depends on the totality of the circumstances, including the information known to the officer and any reasonable inferences to be drawn at the time of the stop. *United States v. Arvizu*, 534 U.S. 266 (2002); *United States v. Foster*, 824 F.3d 84, 89 (4th Cir. 2016). The legitimacy of an investigative stop thus turns on what constitutes reasonable suspicion, which the Fourth circuit has called "a commonsensical

5

proposition…[properly] crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir. 1993). Therefore, an investigative stop based on an objectively reasonable mistake of law or fact may nevertheless be found reasonable. *See e.g.*, *Heien v. North Carolina*, 135 S. Ct. 530, 535-40 (2014); *Hill v. California*, 401 U.S. 797, 802-05 (1971).

Many factors may properly contribute to reasonable suspicion. The Fourth Circuit has recognized the following factors as contributing to reasonable suspicion although they may, acting alone, be insufficient: (1) presence in a high-crime area, *United States v. Johnson*, 599 F.3d 339, 345 (4th Cir. 2010); (2) informant tips, *Alabama v. White*, 496 U.S. 325, 329-30 (1990); (3) observation by law enforcement of what appears to be criminal conduct based upon their experience, *Terry*, 392 U.S. at 22-23; *Adams v. Williams*, 407 U.S. 143, 145 (1972); (4) evasive conduct, *United States v. Smith*, 396 F.3d 579, 585-87 (4th Cir. 2005); (5) furtive behavior, *United States v. Sims*, 296 F.3d 284, 285-87 (4th Cir. 2002); (6) "observing a bulge…in a suspect's clothing," *United States v. Baker*, 78 F.3d 135, 137 (4th Cir. 1996); and (7) a person's prior criminal record, *United States v. Powell*, 666 F.3d 180, 188 (4th Cir. 2011) ("a person's possible involvement in prior criminal activity (*i.e.,* "caution data") can be relevant in establishing reasonable suspicion").

### A. Officers Engaged Peters in a Voluntary Encounter

Here, the encounter between law enforcement officials and Peters was as a voluntary encounter. Officers approached Peters and Garrison to inquire whether they were trespassing. Garrison acknowledged that he was, showed officers his waistband, and then left the area. That he felt comfortable doing so and was not further detained highlights the voluntary nature of this initial interaction. After Garrison left, Peters stopped walking and continued speaking with officers, without being asked to do so. This choice further underscores the voluntary nature of the

6

encounter. That the officers asked Peters questions during the voluntary encounter does not transform the otherwise voluntary encounter into an investigative detention. Peters's response to those questions, coupled with his evasive conduct and ultimate revelation of a bulge consistent with a firearm, provided officers with reasonable, articulable, and individualized suspicion to believe that Peters was armed and dangerous—justifying their seizure and frisk.

### B. Officers had Reasonable Articulable Suspicion to Believe Defendant was Engaging in Criminal Activity

Even if officers had seized Peters prior to grabbing his arm and patting the observed bulge, the brief detention was supported by their reasonable, articulable suspicion that Peters was engaging in criminal activity, specifically that he was trespassing. Here, Officer Butler engaged with Peters for three reasons: (1) he knew Peters to have a trespass charge related to his presence in Creighton Court in 2011 and, therefore, believed him to be barred from the property; (2) he believed him to be trespassing in light of Peters's presence with a non-resident and the officer's right to investigate trespassing; and (3) several facts that Officer Butler knew about Peters which caused him to suspect that defendant was engaged in criminal activity in Creighton Court.

First, Officer Butler reasonably believed Peters to be barred based on his prior charge for trespassing in Creighton Court and his presence with another barred individual. Although Peters denied being barred, Officer Butler was not required to accept that blanket denial. *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) ("[P]robable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts."). Indeed, Officer Butler attempted to gather additional information that would assist him in verifying whether defendant was barred by asking defendant for his identification. When defendant stated he did not have his identification card with him, Officer Butler simply continued to question him about his purpose on the property and about his understanding that defendant was not allowed to be on the property. While these

7

inquiries may not have been as expedient as defendant would like, that does not make this encounter contrary to the Fourth Amendment.[1] Further, the fact that Officer Butler also asked questions about whether defendant was armed did not violate the Constitution considering, for the reasons stated below, Officer Butler had a reasonable suspicion at that time that defendant was armed and dangerous. Moreover, even if Peters was not barred, Officer Butler's mistake as to that fact was clearly reasonable given Peters's charge of trespassing, his knowledge that Peters did not live on the property, and defendant's presence with another barred, non-resident who, himself, had a significant criminal history. Accordingly, while defendant makes much of the fact that he was not, in fact, convicted of trespassing and no longer officially barred, that does not foreclose the question of whether Officer Butler had a reasonable suspicion that defendant was barred from the property.

Second, , apart from Officer Butler's reasonable suspicion that defendant was barred by RRHA from the property, Officer Butler, doubtlessly, had the authority to enforce trespass laws against individuals who were not "1) the guest of a resident, 2) an RRHA employee, or 3) on the property for a legitimate business or social purpose."[2] In this case, Officer had reasonable suspicion to investigate Peters for trespassing because, barred or not, Peters was found within Creighton Court without a resident leaseholder, in violation of RRHA's trespassing rules. So, while he may have been there for a legitimate business or social purpose, Officer Butler had every right to inquire of Peters what was his business on the property, especially in light of who he was with, and the officers knowledge of Peters's history and other suspicions about Peters's alleged criminal behavior in Creighton Court.

---

1      *See infra* at 13-14.
2      *See supra* at 1.

Third, coupled with the suspicion that defendant was trespassing on the property, Officer Butler had reasonable suspicion that defendant was involved in criminal activity considering several of the factors which the Fourth Circuit recognized supports an officer's rationale in making a *Terry* stop. Peters was in a high-crime area, Creighton Court. *See United States v. Curry,* No. 3:17-CR-130, 2018 WL 1384298 (E.D. Va. 2018) (finding officers were assigned to patrol Creighton Court because "[t]here had been a rash of shootings and homicides."). Additionally, a confidential source, one known to the Richmond Police Department to be reliable, had previously informed Officer Butler that Peters was engaging in drug dealing at Creighton Court. Specifically, the informant stated that Peters dealing drugs out of an apartment on the 2000 block, where the officers found Peters. Additionally, Peters was known to RPD through its electronic systems as a person who was suspected to be a narcotics dealer and "probably armed."

Further, during their consensual encounter with Peters, Peters engaged in both evasive and nervous behavior by failing to comply with the requests of officers and by continually patting his pockets. That is also when Officer Butler noticed the bulge in defendant's waist which, based on information learned from other sources, was consistent with a person possessing a firearm. This observation would, of course, be bolstered by the fact that drug-trafficking and firearms are often concomitant criminal behaviors. Thus, already thinking defendant may be involved in trespassing and/or drug-trafficking, Officer Butler could reasonably suspect that Peters possessed a firearm as accompaniment to his drug-trafficking. Although each of these factors—standing alone—might be insufficient to establish reasonable suspicion, when considered together in the context of Peters' stop, they support officers' reasonable suspicion to believe Peters was engaged in criminal activity and their decision to initiate contact with him.

This case is similar to *United States v. Bumpers*, 705 F.3d 168 (4th Cir. 2013) in which the Fourth Circuit held that police officers possessed reasonable suspicion that the defendant was trespassing at the time of a *Terry* stop. There, officers were keenly aware of the area's criminal history, a store owner had filed a formal request with police to "enforce criminal violations" on the premises, the area where the men were standing was posted with "no trespassing" and nothing indicated that they had been lawful patrons of store, and defendant and other men reacted by walking away "at a fast pace." 705 F.3d 168, 174-75 (4th Cir. 2013).

Here, the MOU between Richmond Police Department and RRHA regarding trespassing represents a similar agreement as the one in *Bumpers*, where the store owner requested police enforce criminal violations on the premises. Similarly, as in *Bumpers*, "No Trespassing" signs were posted at Creighton Court and there was no evidence Peters was with a lawful leaseholder. Further, Officer Butler was also aware of the high crime rate in the Creighton Court area, just as the officer in *Bumpers* was. This case is even stronger than *Bumpers* because, in addition to the trespassing suspicions, Officer Butler also had a "face-to-face" reliable confidential source who informed him that Peters was engaged in drug distribution in the exact area Peters was found in Creighton Court. *See United States v. Lawing*, 703 F.3d 229, 237 (4th Cir. 2012) (holding face-to-face tips to be more trustworthy and reliable than tips from anonymous sources).

### C. Officers Were Diligently Pursing a Means of Investigation that was Likely to Confirm or Dispel their Suspicion

Under *Terry*'s second prong, the seizure must be limited both in scope and duration. *Florida v. Royer,* 460 U.S. 491, 500 (1983) (plurality opinion). With regard to the scope component, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* With regard to the duration component, we evaluate "whether the police diligently pursued a means of investigation that was

10

likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *United States v. Sharpe,* 470 U.S. 675, 686 (1985). Officers are allowed to engage in questions unrelated to the reasons for the stop in order to conduct safety-related checks. *See United States v. Hill*, 852 F.3d 377, 832 (4th Cir. 2017) ("An officer may engage in certain safety measures during a traffic stop"); *United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016) ("An officer is entitled to conduct safety-related checks that do not bear directly on the reasons for stop"). Indeed, in *Terry* itself, the Supreme Court emphasized the "immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him." *See Terry,* 392 U.S. at 23.

Here, officers engaged in the questioning of Peters, a minimally intrusive method, to determine whether he was trespassing. Further, without the presence of Peters's identification card, the ability of the officers to determine if Peters was barred was circumscribed. Officers were not required to accept Peters's claim that he was no longer barred. *Wesby*, 138 S. Ct. at 588. But, even if they had, Peters's denial of that fact did nothing to dispel the officers' suspicion concern regarding whether Peters was then trespassing and what his business was on the property. Further, the officers' concern for their safety in being unable to determine if Peters was armed restricted their ability to investigate such matters. The officers were reasonably allowed to inquire as to weapons during their encounter with Peters.

### D. Officers had Reasonable Suspicion to Believe that Defendant was Armed and Dangerous

An officer may conduct a limited pat down for weapons when there is a reasonable suspicion that a suspect is both armed and dangerous. *Terry*, 392 U.S. at 27. In *United States v. Robinson,* the Fourth Circuit held that no further evidence of "dangerousness" is required when there is reasonable suspicion an individual is armed. 846 F.3d 694, 699-701 (4th Cir. 2017) (en

11

banc) ("In both *Terry* and *Mimms,* the Court deliberately linked 'armed' and 'dangerous,' recognizing that the frisks in those cases were lawful because the stops were valid and the officer reasonably believed that the person stopped 'was armed and thus' dangerous…The use of 'and thus' recognizes that the risk of danger is created simply because the person, who was forcibly stopped, is armed."). In this context, reasonable suspicion is a particularized and objective basis for suspecting that the person to be frisked is armed and, thus, dangerous. *Ornelas v. United States,* 517 U.S. 690, 696 (1996).

"The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry,* 392 U.S. at 27. "The determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior," *Wardlow,* 528 U.S. at 125, and it is measured by the totality of the circumstances. *United States v. Powell*, 666 F.3d 180 (4th Cir. 2011). If an officer, while conducting a pat down, "feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons." *Minnesota v. Dickerson*, 508 U.S. 366, 375 (1993); *United States v. Hernandez-Mendez,* 626 F.3d 203, 211-13 (4th Cir. 2010).

Officer Butler had reasonable suspicion to believe that Peters was armed and, thus, dangerous. From looking at the RMS, Officer Butler knew Peters to be a narcotics user who was "probably armed" and also knew Peters to have a gun and drug conviction previously. *See United States v. Brockington,* 849 F.2d 872, 876 (4th Cir. 1988) (recognizing that guns are common tools of drug trade, approving frisk). Based upon this background knowledge, Peters's nervousness, as shown through his refusal to lift his shirt and his continual touching of his hoodie pocket, as well

as Officer Butler's knowledge of how guns are commonly carried, Officer Butler believed Peters to have a weapon. Further, Officer Butler saw a gun-like bulge in the front of Peters's pants. Under the "plain feel doctrine," after Officer Butler felt the gun in Peters's pants during the pat-down, he was authorized to seize the weapon. *Dickerson*, 508 U.S. at 375.

This case is similar to *United States v. Black*, in which the Fourth Circuit held that officers had reasonable suspicion that Black was armed and thus dangerous when he was in a high crime area, had his hands in his pockets and hesitated to remove them, the officer saw a bulge in the Black's jeans, and then Black stated he had nothing in his pocket. 525 F.3d 359, 365 (4th Cir. 2008). Here, Peters was similarly in a high crime area and was hesitant to comply with the officers' requests that he lift his hoodie. Further, Officer Butler saw a bulge in Peters's pants, like the officer did in *Black*. Here, the officer, additionally, had the background knowledge of Peters's reported drug distribution and his previous gun and drug conviction.

### III. CONCLUSION

Officer Butler and Trainee Cooper had reasonable, articulable suspicion to believe Peters was engaging in criminal activity, trespassing and drug-trafficking, when Peters was located in a high crime area, a reliable confidential source informed officers that Peters was dealing drugs in that area, the officer knew Peters had both a trespassing charge and a conviction for drug and gun charges, and Peters was present with a non-leaseholder who was also barred and suspected of drug-trafficking. With this knowledge, the officers initiated a voluntary encounter in which Peters stopped and spoke with them. Even if the encounter were a seizure, it was one justified by reasonable, articulable, and individualized suspicion. Further, officers limited the encounter's scope to determine if Peters was barred or trespassing and to ensure their own safety. Finally, officers had reasonable suspicion to believe that Peters was armed and, thus, dangerous because

13

of his evasive, nervous behavior, the bulge seen in his pants, his presence in a high crime area, and his background with a gun and drug conviction. Therefore, officers lawfully conducted a *Terry* stop and frisk and the evidence should not be suppressed.

        Respectfully submitted,

        G. Zachary Terwilliger
        United States Attorney

By:        /s/
        Stephen E. Anthony
        Assistant United States Attorney
        Virginia Bar No. 78246
        Assistant U. S. Attorney
        Office of the U.S. Attorney
        919 East Main Street, Suite 1900
        Richmond, Virginia 23219
        (804) 819-5400
        (804) 771-2316 (fax)
        Stephen.E.Anthony@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of July, 2019, I will electronically file the foregoing with the Clerk of the Court using the CM/ECF filing system which will then send a notification of such filing (NEF) to counsel of record.

           /s/ _____
Stephen E. Anthony
Virginia Bar No. 78246
Assistant U. S. Attorney
Office of the U.S. Attorney
919 East Main Street, Suite 1900
Richmond, Virginia 23219
(804) 819-5400
(804) 771-2316 (fax)
Stephen.E.Anthony@usdoj.gov